**ORAL ARGUMENT NOT YET SCHEDULED**

Appeal No. 22-1052

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

*AMAZON SERVICES LLC,*

*Petitioner,*

*v.*

*UNITED STATES DEPARTMENT OF AGRICULTURE,*

*Respondent.*

On Petition for Review of Order of the
United States Department of Agriculture

**REPLY BRIEF OF PETITIONER AMAZON SERVICES LLC**

William Brendan Murphy
Alison R. Caditz
PERKINS COIE LLP
1201 Third Avenue,
Suite 4900
Seattle, WA 98101-3099
Telephone: 206.359.8000
BMurphy@perkinscoie.com
ACaditz@perkinscoie.com

Lawrence Reichman
PERKINS COIE LLP
1120 N.W. Couch Street,
10th Floor
Portland, OR 97209-4128
Telephone: 503.727.2000
LReichman@perkinscoie.com

*Counsel for Petitioner
Amazon Services LLC*

# TABLE OF CONTENTS

**PAGE**

GLOSSARY .................................................................................. v

SUMMARY OF ARGUMENT .................................................. 1

ARGUMENT ............................................................................. 3

I.     The Department offers a legally untenable *third* new theory
       of secondary liability in this appeal .................................... 3

II.    The text, structure, and history of the AHPA and PPA do not
       support any of the Department's shifting interpretations. ........... 7

III.   The Department's interpretations are not entitled to
       *Chevron* deference. ............................................................ 18

IV.    The *Iran Air* and *Federal Express* cases do not support the
       Department's interpretations. .............................................. 21

V.     A remand is unnecessary because the Department offered no
       evidence of knowledge or substantial assistance—under any
       formulation of those terms. ................................................ 24

VI.    The Department's penalty analysis further demonstrates its
       arbitrary approach. ........................................................... 27

CONCLUSION ......................................................................... 28

CERTIFICATE OF COMPLIANCE ......................................... 30

CERTIFICATE OF SERVICE .................................................. 31

# TABLE OF AUTHORITIES

PAGE(S)

**CASES**

*Cent. Bank of Denver, N.A. v. First Interstate Bank of
Denver, N.A.*, 511 U.S. 164 (1994) ......................................................... 17

*Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*,
467 U.S. 837 (1984) .................................................................. 7, 18, 19

*Culbertson v. USDA*,
69 F.3d 465 (10th Cir. 1995) ...................................... 3, 8, 13, 15, 16, 23

*Fed. Express Corp. v. U.S. Dept. of Commerce*,
486 F. Supp. 3d 69 (D.D.C. 2020),
*aff'd*, 39 F.4th 756 (D.C. Cir. 2022) ...................................................... 22

*Fed. Express Corp. v. United States Dep't of Com.*,
39 F.4th 756 (D.C. Cir. 2022) ........................... 3, 10, 16, 21, 22, 23, 24

*Halberstam v. Welch*,
705 F.2d 472 (D.C. Cir. 1983) ........................................ 8, 9, 10, 25, 26

*Howard v. SEC*,
376 F.3d 1136 (D.C. Cir. 2004) .............................................................. 5

*Inv. Rsch. Corp. v. SEC*,
628 F.2d 168 (D.C. Cir. 1980) ........................................ 2, 5, 11, 12, 25

*Iran Air v. Kugelman*,
996 F.2d 1253 (D.C. Cir. 1993) ...................................... 3, 21, 22, 23, 24

*Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*,
545 U.S. 913 (2005) ................................................................... 18, 20

*Monsen v. Consol. Dressed Beef Co.*,
579 F.2d 793 (3d Cir. 1978) ................................................................ 24

*New Prime, Inc. v. Oliveira*,
139 S. Ct. 532 (2019) ......................................................................... 17

# TABLE OF AUTHORITIES
## (Continued)

PAGE(S)

*Peter Pan Bus Lines, Inc. v. Fed. Motor Carrier Safety
Admin.*, 471 F.3d 1350 (D.C. Cir. 2006) .............................................. 19

*Prill v. NLRB*,
755 F.2d 941 (D.C. Cir. 1985) ............................................................. 19

*Reed v. USDA*,
No. 93-9535, 1994 WL 596616 (10th Cir. Nov. 1, 1994) ..................... 14

*\*Rosemond v. United States*,
572 U.S. 65 (2014) ....................................................................... 2, 9, 18

*Sekhar v. United States*,
570 U.S. 729 (2013) ......................................................................... 7, 18

*United States v. Encarnacion-Ruiz*,
787 F.3d 581 (1st Cir. 2015) ........................................................ 11, 12

*United States v. McGoff*,
831 F.2d 1071 (D.C. Cir. 1987) ............................................................ 7

*Valkering, U.S.A., Inc. v. USDA*,
48 F.3d 305 (8th Cir. 1995) ................................................................ 14

**STATUTES**

7 U.S.C. § 7702 ........................................................................................ 16

7 U.S.C. § 8302 ................................................................................... 13, 16

18 U.S.C. § 2 .............................................................................................. 9

19 U.S.C. § 1484 ....................................................................................... 6

**REGULATIONS**

9 C.F.R. § 78.1 (1995) ............................................................................. 16

# TABLE OF AUTHORITIES
## (Continued)

PAGE(S)

19 C.F.R. Part 111 ........................................................................ 6

**ADMINISTRATIVE DECISIONS**

51 Fed. Reg. 32,574, 32,577 (1986) ........................................ 16

*In Re: Mercedes Capistrano,*
    45 Agric. Dec. 2196 (U.S.D.A. 1986) .................................. 14

*In Re: Mr. Francisco Escobar, Jr.,*
    54 Agric. Dec. 392 (U.S.D.A. 1995) .................................... 14

*In Re: Norea Ivelisse Abreu,*
    P.Q. Docket No. 99-0045, 2002 WL 113758 (U.S.D.A. 2002) ............. 14

*In Re: Rene Vallalta,*
    45 Agric. Dec. 1421 (U.S.D.A. 1986) .................................. 14

*In Re: Richard Duran Lopez,*
    44 Agric. Dec. 2201 (U.S.D.A. 1985) .................................. 14

*In Re: Shulamis Kaplinsky,*
    47 Agric. Dec. 613 (U.S.D.A. 1988) .................................... 14

*Iran Air*, 57 Fed. Reg. 39,178, 39,180 (Aug. 28, 1992) ............ 24

**OTHER AUTHORITIES**

Restatement (Second) of Torts § 876(d) (comment on clause
    (b)) (Am. L. Inst. 1979) ...................................................... 26

*Authorities upon which the brief chiefly relies are marked with asterisks.

**GLOSSARY**

| Abbreviation or Acronym | Definition |
|---|---|
| AHPA | Animal Health Protection Act (7 U.S.C. §§ 8301 *et seq.*) |
| Br. | Brief of Petitioner Amazon Services LLC |
| Department | United States Department of Agriculture |
| Opp. | Brief of Respondent Department of Agriculture |
| PPA | Plant Protection Act (7 U.S.C. §§ 7701 *et seq.*) |
| Service | Animal and Plant Health Inspection Service |

## SUMMARY OF ARGUMENT

The Department bases importation liability on an unsupported and untenable view that Amazon should serve as a private customs agency that prevents third parties from violating importation regulations. Its own brief makes this point clear. It asserts that "the core of Amazon's violations is its failure to take steps to ensure compliance with the Secretary's regulations, regardless of its specific knowledge of the third-party shippers' misconduct." Opp. at 57. This statement echoes the Chief Administrative Law Judge's assertion that "Amazon failed to place stop guards that would prevent violations of the" AHPA and PPA by third parties. JA 424. To be clear, the "compliance" referred to is ensuring that *third parties* have proper documentation before sending certain products into the United States, yet the Department offered no evidence that Amazon was aware of the lack of documentation or had any opportunity or legal right to demand proof of this documentation. And the "violations" referred to are committed by *third parties* without Amazon's knowledge and well before Amazon ever receives the products.

Enlisting private entities to police compliance by others might be appealing as an abstract policy but adopting it by administrative fiat is inconsistent with the rule of law. Setting aside that Amazon was not involved in importing the products at issue, Congress did not make it "incumbent on all those who play a role in the importation" of products to "actively work to prevent" importation violations by third parties. Opp.

at 36. Nor did it implicitly invite the Department to do so by writing ambiguous statutes. It chose words with clear and long-standing meanings—"reflect[ing] a centuries-old view of culpability," *Rosemond v. United States*, 572 U.S. 65, 70 (2014)—to define the proscribed acts.

The secondary liability language in the AHPA and PPA is not a catch-all that can support the Department's novel theory. Treating it as such distorts the long-standing meaning of this language and would create virtually unchecked liability for third parties' violations. For example, basing liability on purportedly failing to "take steps to ensure compliance" would ensnare stores that place orders for shipment from abroad, banks that finance importation, publications that advertise imported goods, and even consumers who place orders for international products. *See* Opp. at 46. "The awareness of wrong-doing requirement for aiding and abetting liability is designed to [e]nsure that innocent, incidental participants in transactions later found to be illegal are not subjected to harsh, civil, criminal, or administrative penalties." *Inv. Rsch. Corp. v. SEC*, 628 F.2d 168, 177 (D.C. Cir. 1980). The Department impermissibly reads this protection out of the statutes. Compounding the problem, the Department never identifies the specific "steps" it deems necessary nor any practical means that Amazon and others would have to accomplish them.

The AHPA's and PPA's text, structure, and history do not indicate that Congress intended such broad liability or for secondary liability

language to mean something radically different in these statutes than virtually every other area of law. The *Iran Air* and *Federal Express* cases that the Department relies on cannot provide the necessary indication. They involved different statutes administered by a different agency with a different interpretation of secondary liability that Congress adopted in reauthorizing those statutes. The historical view of secondary liability here, by contrast, "requires an element of culpability together with direct involvement" in the third party's wrongdoing. *Culbertson v. USDA*, 69 F.3d 465, 468 (10th Cir. 1995).

The Department's interpretation and penalty order are untethered to the statutes it charged Amazon with violating. The Department reached well beyond both Congress's authorization and the practical ability of private actors to police compliance by others. This Court should reverse and direct judgment as a matter of law for Amazon.

## ARGUMENT

### I. The Department offers a legally untenable *third* new theory of secondary liability in this appeal.

The Department offered two different interpretations of "aid, abet, cause, or induce" in the proceedings below and now offers a third in this appeal. The Chief Administrative Law Judge applied a "but-for" causation test, concluding that "[b]ut for the services that Amazon provides, the subject violations of the AHPA and PPA could not have occurred." JA 419. The Judicial Officer pivoted to a "benefits provided"

test, concluding that the "benefits provided, or intended to be provided, by Amazon to the third-party sellers did 'aid, abet, cause, or induce' the restricted products to be moved into the United States." JA 467.

The Department does not defend either interpretation before this Court, perhaps out of recognition that they are indefensible. Instead, it asserts that Amazon aided, abetted, caused, or induced third parties' violations by "play[ing] a role in" importation. Opp. at 36; *see also id.* at 24, 27. Amazon did not play any role in the importation. As the Department notes, this proceeding involves "instances where Asia-based third-party sellers"—not Amazon—"shipped animal or plant products to Amazon warehouses without complying with import restrictions imposed by the Secretary." *Id.* at 9. Amazon's purported "role" was "operat[ing] an online store" and offering "additional services … through its 'Fulfillment By Amazon' program"—services which are both entirely lawful and do not assist in importation in any way. *Id.* at 24; *see also id.* at 27 (asserting that Amazon "would handle virtually all aspects of the *domestic* transaction" (emph. added)). The Fulfillment By Amazon services the Department cites would all take place in the United States *after* the third-party sellers imported the products and shipped them to an Amazon warehouse.

The Department also suggests that Amazon aids, abets, causes, or induces third parties' violations by failing to "take steps … [to] confirm that the products may be lawfully imported, as well as that any

applicable requirements for that importation are being met." Opp. at 48. The Department never explains what these specific steps should be, much less ties these unknown steps to specific statutory or regulatory obligations. The AHPA and PPA do not impose a duty to prevent independent third parties from violating their importation obligations, much less to act as a shadow customs agency for imports initiated by all third-party sellers (for which Amazon would have no legal right).

The secondary liability language in the AHPA and PPA does not impliedly impose such a duty. The words "aid, abet, cause, or induce" connote an action that assists or procures a third party's violation, whereas not preventing a third party's violation is the absence of an action. And the legal meaning of those words with their centuries-long pedigree has never been understood to encompass non-action by an innocent actor. Consistent with this pedigree, this Court has repeatedly refused to create a duty to discover third parties' wrongdoing under the guise of secondary liability. A "duty to investigate potential violations of law" would "in essence … amount to eliminating (any awareness of wrong-doing) as a necessary element in imposing aiding and abetting liability." *Inv. Rsch.*, 628 F.2d at 178; *see also Howard v. SEC*, 376 F.3d 1136, 1138, 1143 (D.C. Cir. 2004) (reasoning that "aiding and abetting liability cannot rest on the proposition that the person 'should have known' he was assisting violations of the securities laws," and holding

that the district court had erred by "applying a 'should have known' negligence standard that we have rejected").

Requiring private parties to police importations by third parties would create an impossible burden (and the risk of significant penalties) that would have no discernible limits or practical means to implement. It would apply equally to common carriers which transport goods, stores which order goods that originate abroad, and customers who fail to adequately investigate whether the products they are ordering could be legally imported. Congress cannot possibly have intended such a radical result in using longstanding secondary liability terms.

The Department imputes to Amazon a role in third parties' importation that has no basis in the record. Reviewing the "contents of, and documentation for, expected shipments" to "confirm" satisfaction of importation requirements would put Amazon in the position of an importer of record or licensed customs broker, or of the U.S. Customs and Border Protection or the Department themselves. Opp. at 48; 19 U.S.C. § 1484 (identifying obligations of importer of record); 19 C.F.R. Part 111 (establishing licensing requirements and obligations of customs brokers). Nothing in the record indicates Amazon had the ability to perform any of these functions for the shipments in question. Amazon did not even order the goods; Amazon was simply the addressee of the packages.

The Department continues to miss the point in asserting that Amazon tries to "insulate itself from legal responsibility" through its

contracts with third-party sellers. Opp. at 27, 48. Amazon did not contractually *shift* those obligations to sellers because Amazon did not have those obligations in the first place. Amazon used commercially available means like contractual requirements to reinforce with sellers their responsibility for knowing and complying with importation requirements for their products.

In short, Congress nowhere mandated that addressees of packages from abroad must "confirm that the products may be lawfully imported" at pain of being deemed importers themselves. Opp. at 48. Congress created a well-established regulatory regime that defines importation obligations; the Department cannot alter it by enlisting private parties to police compliance by others when expedient to do so.

## II. The text, structure, and history of the AHPA and PPA do not support any of the Department's shifting interpretations.

Absent "other indication, Congress intends to incorporate the well-settled meaning of the common-law terms in uses." *Sekhar v. United States*, 570 U.S. 729, 732 (2013) (cleaned up). The "other indication[s]" that the Department sees in the "text, structure, and history" of the AHPA and PPA do not support its attempt to radically diverge from the longstanding meanings of the secondary liability language Congress used. Opp. at 19. They also do not create ambiguity that can be filled with novel interpretations via *Chevron* deference. The Court must "accord the term[s] [their] traditional legal meaning." *United States v. McGoff*, 831

F.2d 1071, 1078 (D.C. Cir. 1987). That traditional legal meaning requires knowledge of the third parties' wrongdoing and substantial assistance. Whether those elements are phrased as awareness of one's role in an overall illegal activity and substantial and knowing assistance (the formulation in this Court's *Halberstam* decision) or culpability and direct involvement (the formulation in *Culbertson*)—or some other phrasing—they consistently require knowledge of and assistance to wrongdoing that were wholly absent from the Department's proofs below.

**Text.** The Department identifies no textual basis for its newfound theory that purportedly "having a role" in importation, no matter how miniscule or remote, or failing to prevent violations by third parties, somehow aids, abets, causes, or induces third parties' illegal importation. The words that anchor these theories—"role" and "prevent"—appear nowhere in the statutory provisions that the Department claims Amazon violated. Similarly, the "benefits provided" test that the Judicial Officer used has no grounding in the text. Br. at 18–32.

The Department instead points to non-existent text, namely the absence of an express mens rea requirement in the "aid, abet, cause, or induce" provision. Opp. at 39. But the absence of a mens rea requirement is hardly "a contrary direction" from Congress supporting the Department's expansive view of liability, as precedent from the Supreme Court and this Court show.

The secondary liability statute that the Supreme Court interpreted in *Rosemond* had no express mens rea element. The statute at issue in that case states that "[w]hoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission is punishable as a principal." *Rosemond*, 572 U.S. at 68 (quoting 18 U.S.C. § 2). Despite the lack of a mens rea word modifying its verbs, the Court held that this language "derives from (though simplifies) common-law standards for accomplice liability" and "reflects a centuries-old view of culpability." *Id.* at 70. Specifically, secondary liability requires "an affirmative act in furtherance of the offense" and "intent of facilitating the offense's commission." *Id.* at 71; *see also* Br. at 22–24, 34 (addressing *Rosemond*). *Rosemond* puts to rest the Department's contention that the absence of an express mens rea modifier signifies no culpability requirement.

The Department does not engage with *Rosemond*, instead dismissing it in a parenthetical as "addressing 'federal criminal law'." Opp. at 42. But the "centuries-old view of culpability" that *Rosemond* referenced exists in the civil context as well, as this Court's *Halberstam* decision shows. *Halberstam v. Welch*, 705 F.2d 472 (D.C. Cir. 1983). *Halberstam* held that civil aiding and abetting requires that the defendant be "generally aware of [its] role as part of an overall illegal or tortious activity at the time that [it] provides the assistance" and "the defendant must knowingly and substantially assist the principal

-9-

violation." *Id.* at 477. These requirements are "designed to avoid subjecting innocent, incidental participants to harsh penalties or damages." *See id.* at 485 n.14.

The Department asserts that this Court's *Federal Express* decision "conclud[ed] that the omission of a mens rea requirement from a civil penalties provision establishes that no knowledge is required for such penalties." Opp. at 38–39. That misconstrues *Federal Express*. As discussed in section IV below, that decision established only that FedEx could not meet the very high bar set by *ultra vires* standard of review in challenging the Commerce Department's strict liability interpretation of a regulation under a wholly different statutory regime. *Fed. Express Corp. v. United States Dep't of Com.*, 39 F.4th 756, 765 (D.C. Cir. 2022) ("An ultra vires challenge … is essentially a Hail Mary pass.").

The Department would ignore the centuries-old view of culpability because "jurisdictions disagree over whether actual knowledge, a general awareness of the primary tortfeasor's wrongdoing, or recklessness or constructive knowledge are sufficient." Opp. at 42 (cleaned up). It also ignores *Halberstam's* admonition that these "elements can be merged or articulated somewhat differently without affecting their basic thrust." 705 F.2d at 478 n.8. Variations in the knowledge requirement's wording do not justify dispensing with it entirely. Each formulation requires some kind of knowledge of wrongdoing, so even accepting the laxest one still requires a level of culpability that the Department never proved. The

Department also identifies no phrasing variations to support jettisoning the substantial assistance requirement, and it offered no evidence that would satisfy any formulation of that element.

While the Restatement may have taken "no position" on culpability requirements for secondary liability for strict liability offenses, Opp. at 41, the case law makes clear that culpability is required. Courts "have consistently found a mens rea requirement for aiders and abettors of strict liability crimes." *United States v. Encarnacion-Ruiz*, 787 F.3d 581, 589–90 (1st Cir. 2015). In *Investors Research*, for example, this Court observed that "principal violators" could be strictly liable under the Investment Act of 1940 because there "is no language suggesting a scienter requirement." 628 F.2d at 170, 177. But it rejected strict liability for aiders and abettors. The "accused" must have "had a general awareness that his role was part of an overall activity that was improper" and must have "knowingly and substantially assisted the principal violation." *Id.* at 178.

Even where strict liability is appropriate for principal violators, extending it to alleged accessories would ensnare many innocent actors. The "awareness of wrong-doing requirement for aiding and abetting liability is designed to [e]nsure that innocent, incidental participants in transactions later found to be illegal are not subjected to harsh, civil, criminal, or administrative penalties." *Id.* at 177. This "policy is especially germane where the proscribed conduct of the principal may not

always appear to be wrongful ….” *Id.*; *see also Encarnacion-Ruiz*, 787 F.3d at 589 (“even assuming that a principal of a § 2251(a) offense can be held strictly liable[,] … the government’s argument that an aider and abettor must also be held liable without fault has been rejected by longstanding law”). The “special circumstances which justify the imposition of liability without fault on certain persons who themselves engage in the proscribed conduct are not likely to exist as to those rendering aid.” *Encarnacion-Ruiz*, 787 F.3d at 590 (quoting LaFave treatise).

**Structure.** The Department’s primary structural argument is that a mens rea requirement for criminal *penalties* but not civil penalties means Congress intended strict liability for all civil violations. Opp. at 29–32. That argument improperly conflates the elements of a penalty with those of an underlying violation. The elements of a violation and the elements of a penalty are different. The fact that some civil penalties can be imposed on a strict liability basis does not establish that *all* civil violations are strict liability offenses.

The dichotomy between civil and criminal penalties simply reflects different mens rea requirements for two types of penalties. It has nothing to do with the *elements* of the underlying violation. The Department must establish the underlying violation by proving the elements of that violation. For example, if the underlying violation has no knowledge requirement, then civil penalties can appropriately be imposed without

establishing knowledge. But if the underlying violation requires mens rea and the Department does not establish that element, the Department does not even get to the penalties stage.

The statutory or regulatory provisions that create the underlying violation establish the elements the Department must prove. Some elements of a violation have only an act requirement and no mental state, for instance carrying a product into the United States. *See* 7 U.S.C. § 8302(12)(A). But the Department must establish culpability to impose liability for aiding and abetting that same violation. *See Culbertson*, 69 F.3d at 467–68 (requiring an "element of culpability" to impose civil liability for "aid[ing], induc[ing], or caus[ing]" an offense under Department regulation implementing Contagious Cattle Disease Act, even though a "knowingly" requirement was included only in criminal penalties provision); *see also* Br. at 19.

Relatedly, the Department relies on Congress's inclusion of "degree of culpability" as a discretionary civil penalty factor to support the purported "strict liability nature of the statute." Opp. at 33. That factor simply recognizes there is a spectrum of conduct that could lead to a civil penalty; it does not specify what conduct constitutes a violation. Congress's understanding that leniency is appropriate for some civil penalties does not support strict liability for all underlying violations any more than the availability of leniency in criminal proceedings allows the government to impose criminal liability on a strict liability basis.

**History.** The Department contends that the "Secretary has long understood" the AHPA and PPA "to impose strict liability for civil violations." Opp. at 30. Every decision it cites involves liability for violations by a principal, such as liability for carrying a regulated product across the border without complying with importation rules. Opp. at 30–31.[1] None of those decisions addressed secondary liability, let alone held that parties can be held strictly liable for aiding, abetting, causing, or inducing a violation. To the extent the Department "consistently assessed civil penalties even in the absence of knowledge by the violator under those statutes," Opp. at 31, those civil penalties were imposed on

---

[1] *In Re: Richard Duran Lopez*, 44 Agric. Dec. 2201, 2202 (U.S.D.A. 1985) (party liable for bringing prohibited item into the United States); *In Re: Norea Ivelisse Abreu*, P.Q. Docket No. 99-0045, 2002 WL 113758, at *1 (U.S.D.A. 2002) (same); *In Re: Mercedes Capistrano*, 45 Agric. Dec. 2196, 2196 (U.S.D.A. 1986) (same); *In Re: Rene Vallalta*, 45 Agric. Dec. 1421, 1422 (U.S.D.A. 1986) (same); *In Re: Shulamis Kaplinsky*, 47 Agric. Dec. 613, 614 (U.S.D.A. 1988) (same); *In Re: Mr. Francisco Escobar, Jr.*, 54 Agric. Dec. 392, 392 (U.S.D.A. 1995) (same). The Department cites two appellate decisions, both of which are inapposite. Opp. at 31. *Reed v. USDA*, No. 93-9535, 1994 WL 596616 (10th Cir. Nov. 1, 1994) (unpublished) did not involve secondary liability. *Id.* *1–2 (parties held directly liable for shipping cattle interstate without proper certification). And, as Amazon previously showed, *Valkering, U.S.A., Inc. v. USDA*, 48 F.3d 305, 308 (8th Cir. 1995), interpreted the meaning of "allowed to be moved"—a basis for liability that the Department expressly rejected. Br. at 36–37 (quoting JA 413).

principals, not entities who allegedly aided, abetted, caused, or induced third parties' wrongdoing.[2]

At best, the history demonstrates a longstanding view that certain actions by a principal violate importation laws regardless of the principal's intent or knowledge. The Department cannot have "long understood [the AHPA and PPA's] statutory structure to impose strict liability" for aiding, abetting, causing, or inducing when it cannot point to a single decision reflecting that understanding. *See* Opp. at 30. Indeed, other domestic retailers have long ordered goods from abroad—serving as the proximate cause of imports in a way that Amazon did not with respect to the shipments in question—and yet the Department offers no examples of pursuing a secondary liability theory against those stores for the import violations of their suppliers.

The one Department decision addressing secondary liability was reviewed in *Culbertson*, and the Tenth Circuit rejected the Department's view of secondary liability as "insupportably broad." 69 F.3d at 468. The "longstanding understanding" when "Congress enacted the Plant Protection Act in 2000 and the Animal Health Protection Act in 2002," Opp. at 33, was that some violations by a principal had no mens rea requirement but secondary liability required "an element of culpability together with direct involvement." *Culbertson*, 69 F.3d at 468. The

---

[2] Nor did the Judicial Officer identify any Department decision imposing strict liability for the acts of others. *See* Br. at 42 n.6.

Department dismisses *Culbertson* as involving the Contagious Cattle Disease Act—a different statute that "did not expressly provide for aiding and abetting liability." Opp. at 44–45. That distinction is immaterial. The secondary liability language in the regulatory definition of "moved" in *Culbertson* is identical in all material respects to the language in the AHPA's and PPA's definition of "move." *Compare* 9 C.F.R. § 78.1 (1995) ("aided, induced, or caused to be moved"), *with* 7 U.S.C. § 8302(12)(B) ("aid, abet, cause, or induce"), *and* 7 U.S.C. § 7702(9)(B) (same).

The Department's rulemaking record reinforces that it historically understood secondary liability to require culpability. In 1985, the Department expanded a Contagious Cattle Disease Act regulation's definition of "moved" to include "aid[ing], induc[ing] or caus[ing] to be moved." *Culbertson*, 69 F.3d at 467. The Department gave examples of conduct it sought to address, all of which entailed culpability: "a veterinarian who prepares false documents or a seller who promises to have animals tested but does not." *Id.* (quoting 51 Fed. Reg. 32,574, 32,577 (1986)). The Department has pointed to nothing in the historical record showing any understanding that secondary liability was strict liability. This is a crucial point of distinction from *Federal Express*, which involved a demonstrated historical agency interpretation and Congressional acquiescence in that interpretation, both of which are absent here. *See infra*, section IV.

\* \* \*

The Department is stretching secondary liability language to impose legal duties that Congress never imposed. In the Department's view, "Congress … made it incumbent on all those who play a role in the importation of plant and animal products to ensure that they actively work to prevent potentially devastating outbreaks by ensuring compliance with the Secretary's regulations." Opp. at 36–37. Congress said no such thing in the statutes, and there is no reason to believe it chose secondary liability language with a centuries-old legal meaning as an oblique way to do so.

Administrative agencies cannot create new legal duties simply because they view an entity as "standing in responsible relation to a public danger" and because "legislation touches phases of the lives and health of people which are largely beyond self-protection." Opp. at 46 (cleaned up). Courts cannot "pave over bumpy statutory texts in the name of more expeditiously advancing a policy goal," and agencies do not have license to do so either. *New Prime, Inc. v. Oliveira*, 139 S. Ct. 532, 543 (2019). As the Supreme Court stated in rejecting a similar agency attempt to impliedly amend a statute to achieve a policy objective, the courts "cannot amend the statute to create liability for acts that are not themselves manipulative or deceptive within the meaning of the statute." *Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 177–78 (1994); *see also id.* at 188 ("Policy considerations cannot override our interpretation of the text and structure of the Act ….").

## III. The Department's interpretations are not entitled to *Chevron* deference.

Lacking support in the text, structure, and history of the statutes, the Department seeks refuge in the *Chevron* deference applied in cases of statutory ambiguity. Opp. at 50–51. No such deference is appropriate here.

To begin, *Chevron* deference is inappropriate where, as here, the "intent of Congress is clear." *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 842–43 (1984). When Congress speaks clearly, "that is the end of the matter"; "the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Id.*

The "aid, abet, cause, or induce" words are "doctrines of secondary liability" that "emerged from common law principles and are well established in the law." *Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913, 930 (2005). Congress "intends to incorporate the well-settled meaning of the common-law terms it uses" absent "other indication." *Sekhar*, 570 U.S. at 732. There is no "other indication" here, so the Department is not free to ignore the "centuries-old view of culpability" these terms incorporate based on some supposed lack of clarity in their usage. *Rosemond*, 572 U.S. at 70. Where "traditional tools of statutory construction" such as the presumption reflected in *Sekhar* show that "Congress had an intention on the precise question at issue,"

that "intention is the law and must be given effect." *Chevron*, 467 U.S. at 843 n.9.

*Chevron* deference is doubly inappropriate here because the Department did not base its interpretation on an implicit legislative delegation of policy-making authority. "*Chevron* step 2 deference is reserved for those instances when an agency recognizes that the Congress's intent is not plain from the statute's face." *Peter Pan Bus Lines, Inc. v. Fed. Motor Carrier Safety Admin.*, 471 F.3d 1350, 1354 (D.C. Cir. 2006). Far from finding a "gap for the agency to fill," *Chevron*, 467 U.S. at 843, the Department reasoned that "the statutes compel rejection of" Amazon's arguments, JA 456. Deference "to an agency's interpretation of a statute is not appropriate when the agency wrongly 'believes that interpretation is compelled by Congress.'" *Peter Pan*, 471 F.3d at 1354 (cleaned up); *see also Prill v. NLRB*, 755 F.2d 941, 942 (D.C. Cir. 1985) ("judicial deference is not accorded a decision of the NLRB when the Board acts pursuant to an erroneous view of law and, as a consequence, fails to exercise the discretion delegated to it by Congress").

Finally, the Department's construction is not a "reasonable choice within a gap left open by Congress." *Chevron*, 467 U.S. at 866. For one thing, it is difficult to discern what "choice" the Department made because its interpretation of the statutory language keeps changing. To the extent a single thread runs through the Department's reasoning, it is that Amazon is liable for third parties' wrongdoing—but the why and how

are constantly evolving. At the ALJ level, Amazon was liable on a but-for causation theory. JA 419. At the Judicial Officer level, Amazon was liable on a "benefits provided" theory. JA 467. Here, Amazon would be liable on a "playing a role in" importation theory. Opp. at 24, 27, 36. Individually, none of these theories is a reasonable construction of the statutes; collectively, they demonstrate the arbitrariness of the Department's outcome-driven attempt to hold Amazon liable for importation violations of third parties.

The breadth of the Department's various formulations further undermines their reasonableness. Each would ensnare numerous innocent actors who provide legitimate products and services. If "all parties with a role in the importation"—as that phrase is overbroadly cast by the Department—can be held liable, the Department could penalize any unwitting party directly or indirectly involved in importing goods, no matter how remote their "role." *See* Opp. at 24. For example, banks that provide import financing, stores that place orders for international products, entities that transport the products, and publications which sell ad placements for imported products would all be vulnerable under the Department's boundless theory of liability. That result cannot be squared with the "law's reluctance to find liability when a defendant merely sells a commercial product suitable for some lawful use." *Grokster*, 545 U.S. at 936.

**IV. The *Iran Air* and *Federal Express* cases do not support the Department's interpretations.**

The Department leans heavily on this Court's decisions in *Iran Air* and *Federal Express*. Opp. at 20–21, 29, 33–38, 41–44, 47, 52. *Iran Air* is not on point. "Iran Air shipped the generators to Iran," so there was no issue of liability for conduct of third parties. *Iran Air v. Kugelman*, 996 F.2d 1253, 1256 (D.C. Cir. 1993). The "essential question" was whether the Export Administration Act's penalty provision "allow[ed] the imposition of civil sanctions on a strict liability basis." *Id.* at 1258.

The "strict liability interpretation of 'causing'" in *Iran Air*, which this Court referenced in *Federal Express*, 39 F.4th at 769, did not involve secondary liability at all. The issue was whether civil penalties could be imposed on a principal actor even though the agency "neither alleged nor proved that Iran Air had knowingly violated the law." 996 F.2d at 1256. The ALJ's finding on knowledge "did not specify whether he found Iran Air unaware that the signal generators originated from the United States or whether he rested his decision on Iran Air's lack of knowledge that a license was needed for reexport of the generators from Germany to Iran." *Id.* at 1256 n.4. At most, *Iran Air* stands for the proposition that civil penalties may be assessed under a predecessor to the Export Controls Act where the carrier did not know that it was unlawfully shipping regulated items, thereby "causing" them to be reexported. It simply does not address liability for third parties' violations.

The *Federal Express* decision, which Amazon addressed in its opening brief, is also narrower than the Department asserts. Br. at 39–42. This Court declined to find "extreme agency error" under a stringent standard of review—what this Court called a "Hail Mary pass"—while giving "special deference" for "foreign policy and national security" reasons to an agency's long-standing strict liability interpretation that Congress had acquiesced to when enacting the Export Controls Act. *Fed. Express*, 39 F.4th at 764, 768–69.

Like *Iran Air*, the entity accused of violating export laws in *Federal Express* shipped the product, so the case does not squarely present the question of secondary liability for violations committed by third parties. As the District Court framed it, Federal Express challenged "the rationality of imposing strict liability on common carriers, like FedEx, *when they ship a package* to a party on the Entity List, but holding customers liable only if they 'knowingly' engage in a prohibited shipment." *Fed. Express Corp. v. U.S. Dept. of Commerce*, 486 F. Supp. 3d 69, 76 (D.D.C. 2020) (emph. added), *aff'd*, 39 F.4th 756 (D.C. Cir. 2022); *see also id.* at 81 ("In sum, the core of FedEx's revised ultra vires claim is that the Department acts beyond its authority under ECRA if it holds FedEx strictly liable for transferring regulated items, but does so under the guise of aiding and abetting liability.").

The Department erroneously claims that *Federal Express* and *Iran Air* involved "statutes with similar text and structure" to the AHPA and

PPA. Opp. at 20. The Department of Commerce removed "knowingly" from the secondary liability language in an export controls regulation in the 1980s, which was just the beginning of a long history of interpreting secondary liability language in its regulations as imposing strict liability. *Federal Express*, 39 F.4th at 761; *Iran Air*, 996 F.2d at 1257–58. Congress capped off this history in 2018 by "expressly carr[ying] the *mens-rea*-less regulation forward in the 2018 Export Controls Act." *Fed. Express*, 39 F.4th at 768–69. The AHPA and PPA have no comparable history. Congress enacted them against a backdrop of an agency and judicial interpretation that culpability was required for secondary liability. *See supra*, section II; *Culbertson*, 69 F.3d at 468–69.

The discussion in *Federal Express* of the common law is largely dicta. It was unnecessary to the decision, considering all of it comes after the point the Court considered to be the "*coup de grâce* for FedEx's *ultra vires* argument." 39 F.4th at 769. By its own terms, the Court's discussion has little application outside the *ultra vires* context. The Court noted that FedEx's arguments about the common law meaning do "not come close to satisfying the strict standard for an *ultra vires* claim." *Id.* at 772. This was particularly true where the "legal backdrop" was Congressional acquiescence to a long-standing agency strict liability interpretation and a "specialized national security scheme." *Id.* The Court did not address how the common law meaning of secondary liability language dovetails with different statutes' use of that language.

Finally, neither *Federal Express* nor *Iran Air* addressed the substantial assistance requirement. That is unsurprising. FedEx had "transported items to Syria, the United Arab Emirates, and China without the required licenses," 39 F.4th at 761, and Iran Air had placed the purchase order for the generators at issue and "call[ed] for them to be shipped to Iran, thereby setting in motion the entire chain of events that brought about the unauthorized reexport," *Iran Air*, 57 Fed. Reg. 39,178, 39,180 (Aug. 28, 1992). These cases do not excuse the Department from the substantial assistance requirement—a key element of secondary liability that the Department's brief largely ignores. "Equally important as knowledge in establishing an aider-abettor's liability, is proof of his substantial assistance or participation in the primary … violation." *Monsen v. Consol. Dressed Beef Co.*, 579 F.2d 793, 800 (3d Cir. 1978). The Department failed to offer any such evidence here.

## V. A remand is unnecessary because the Department offered no evidence of knowledge or substantial assistance—under any formulation of those terms.

A remand is unnecessary because, as the Department acknowledges, the "facts in this proceeding are essentially undisputed." Opp. at 6. The Department does not defend the Judicial Officer's erroneous conclusion that Amazon would be liable "even if the statutory terms did require knowledge and substantial assistance." JA 468. Because there is no evidence of *any* knowledge or assistance, there is no

need to resolve any disagreement on "the precise quantum of knowledge required" or to "determine the precise conduct that qualifies as 'substantial assistance'." Opp. at 52.

The only argument the Department offers on the knowledge element is that Amazon knew that a product was "being shipped" and that the Department "had issued regulations restricting the import of plant and animal products." *Id.* at 53–54; *see also id.* at 7 (arguing that Amazon "is aware of which products third-party sellers will ship to its warehouses for later fulfillment"). Knowledge that somebody imports products and that there are importation regulations hardly constitutes a "general awareness that [Amazon's] role was part of an overall activity that was improper," *Inv. Rsch.*, 628 F.2d at 178, much less evidence that Amazon "knowingly and substantially assist[ed] in the principal violation." *Halberstam*, 705 F.2d at 477. Similarly, knowing what types of products third-party sellers indicated they would ship and having the right to refuse to accept shipments, Opp. at 7, 25, does not demonstrate awareness of illegal conduct or knowingly and substantially assisting a principal violation.

There is no evidence in the record that Amazon knew any of the products were being imported illegally. It is undisputed that Amazon was not the importer of record or otherwise involved in importing the products and was not privy to the details of importation. JA 247, ¶ 36; JA 388, ¶ 7. The Department asserts that "sellers first register with Amazon the

products they want included in the program," Opp. at 25, but offers no evidence of what this registration entails or how registration confers knowledge of wrongdoing. There is no support in the record for the Department's assertion that "Amazon has all the tools it needs to avoid violations of the statutes" by third parties. Opp. at 48.

The Department tries to reframe the substantial assistance requirement as "encouragement," which in its view would be satisfied by Amazon allegedly telling "third-party sellers to ship their products to the United States." Opp. at 53. It cites Restatement § 876 for this point, but that section applies only where one encourages another *to engage in wrongful conduct*: "if the act encouraged is known to be tortious it has the same effect upon the liability of the adviser as participation or physical assistance." Restatement (Second) of Torts § 876(d) (comment on clause (b)) (Am. L. Inst. 1979). This Court's *Halberstam* decision discussed "cases involving encouragement," Opp. at 53, all of which involved parties who had "encouraged *the wrongful activity*." 705 F.2d at 482 (emph. added). The Department cites no cases imposing liability for encouraging activities that can be engaged in lawfully.

Amazon did not knowingly provide substantial assistance to the third-party sellers' unlawful importations here no matter how those requirements are phrased. Amazon offered entirely lawful, domestic business services, all the while taking extensive measures to educate the sellers about their legal obligations related to importation and promptly

suspending their accounts when it learned of the violations. JA 245, ¶¶ 21–27; JA 247, ¶¶ 37–39; JA 300–14. There is no support for the Department's contention that Amazon could have taken further steps to prevent the third parties from illegally importing their products, or that Amazon "encouraged" illegal activity simply by allowing third parties to sell imported products through its online store.

## VI. The Department's penalty analysis further demonstrates its arbitrary approach.

The same errors the Department made in its application of the statutes infused its assessment of a penalty. It appeals to "public danger" to support its expansive view of liability and justifies a maximum penalty based on the "severe consequences for American agriculture and the general public that could flow from an outbreak of the diseases at issue here." Opp. at 46, 55. The fear of calamity—which never came close to materializing here—seems to be driving the Department's broad view of liability and maximalist view of penalties. But setting penalties based on the remote possibility of a calamity will always result in a maximum penalty, which Congress never intended.

These views also led the Department to disregard culpability as a relevant consideration. It dismisses the "facts" Amazon cited as "restat[ing] Amazon's belief that its conduct was not a violation of the statutes." Opp. at 57. But these facts bear on the nature, extent, and circumstance of the violations, which Congress mandated the

Department consider. These facts also bear on the history of violations and degree of culpability, which Congress authorized the Department to consider (and which the Department purported to address here). The Department improperly equates culpability with not taking "steps to actively ensure compliance" by third parties. Opp. at 58. But the Department never articulates what these alleged "steps" are or acknowledges the steps Amazon did take, such as suspending the third-party sellers' accounts, providing information to the Service, and taking additional steps to identify unknown packages and other third-party violators. JA 247–48, ¶¶ 37–40. Far from showing knowledge of third parties' wrongdoing, the Department can point only to knowledge that third parties import products. That is not enough for liability and certainly not enough to impose a maximum civil penalty.

## CONCLUSION

Administrative agencies cannot stretch longstanding concepts of secondary liability to impose new duties requiring a private entity to police the behavior of third parties. The Court should reverse the Judicial Officer and direct entry of judgment for Amazon.

Dated: January 12, 2023

Respectfully submitted,

<u>/s/ *William Brendan Murphy*</u>
William Brendan Murphy
Alison R. Caditz
PERKINS COIE LLP
1201 Third Avenue,
Suite 4900
Seattle, WA 98101-3099
Telephone: 206.359.8000
BMurphy@perkinscoie.com
ACaditz@perkinscoie.com

Lawrence Reichman
PERKINS COIE LLP
1120 N.W. Couch Street,
10th Floor
Portland, OR  97209-4128
Telephone: 503.727.2000
LReichman@perkinscoie.com

*Counsel for Petitioner Amazon Services LLC*

## CERTIFICATE OF COMPLIANCE

I certify that this brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 6,458 words, excluding the parts exempted by Rule 32(f). I further certify that the brief complies with the typeface and type-style requirements of Rule 32(a)(5)–(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in 14-point Century Schoolbook and Palatino Linotype fonts.

/s/ *William Brendan Murphy*
William Brendan Murphy

**CERTIFICATE OF SERVICE**

I certify that on January 12, 2023, I electronically filed the foregoing brief with the Clerk of Court for the United States Court of Appeals for the District of Columbia Circuit using the CM/ECF system. I further certify that all participants in the case are registered CM/ECF users and that service will be accomplished through the CM/ECF system.

/s/ *William Brendan Murphy*
William Brendan Murphy